UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

LORNA A. OSBORNE,

                Plaintiff,

v.                                            Case No.  5:08-cv-347-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                Defendant.

_____

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 13), and both parties have filed briefs outlining their respective positions. (Docs. 17 & 19.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

On February 16, 2005, Plaintiff filed applications for a period of disability, disability insurance benefits, and supplemental security income,[1] alleging a disability onset date of December 17, 2004. (R. 77-81, 89-90.) Plaintiff's application for disability insurance benefits was denied initially and upon reconsideration. (R. 55-62, 64-69, 72-76.) Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 53.) The ALJ conducted Plaintiff's administrative hearing on March 9, 2007. (R. 370-

---

[1] Plaintiff is only appealing the Commissioner's decision as to her application for disability insurance benefits.

415.) The ALJ issued a decision partially unfavorable to Plaintiff on June 27, 2007. (R. 9-28.) Plaintiff's request for review of the hearing decision by the Social Security Administration's Office of Hearings and Appeals was denied.  (R. 5-8.) Plaintiff then appealed to this Court. (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial  evidence.[2] Substantial evidence is more than a scintilla in that the evidence must do more than merely "create a suspicion of the existence of [a] fact," and must include "such relevant evidence as a reasonable person would accept as adequate to support the conclusion."[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[2] *See* 42 U.S.C. § 405(g).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[6]   The law

defines disability as the inability to do any substantial gainful activity by reason of any

medically determinable physical or mental impairment that can be expected to result in

death, or has lasted or can be expected to last for a continuous period of not less than

twelve months.[7] The impairment must be severe, making Plaintiff unable to do her

previous work, or any other substantial gainful activity which exists in the national

economy.[8]

     The ALJ must follow five steps in evaluating a claim of disability.[9] First, if a

claimant is working at a substantial gainful activity, she is not disabled.[10] Second, if a

claimant does not have any impairment or combination of impairments which

significantly limit her physical or mental ability to do basic work activities, then she does

not have a severe impairment and is not disabled.[11] Third, if a claimant's impairments

meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the

Code of Federal Regulations, she is disabled.[12] Fourth, if a claimant's impairments do

---

[6] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. See Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] Id. § 404.1520(c).

[12] Id. § 404.1520(d).

not prevent her from doing past relevant work, she is not disabled.[13] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[18] In a situation where both exertional and non-exertional impairments are

---

[13] 20 C.F.R. § 404.1520(e).

[14] Id. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[16] Doughty, 245 F.3d at 1278 n.2.
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[17] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

[18] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker v. Bowen, 826 F.2d 996,
(continued...)

4

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the grids as a framework to evaluate vocational factors so long as the ALJ introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[21] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[22]

## III. <u>SUMMARY OF THE RECORD EVIDENCE</u>

Plaintiff was forty-three (43) years old at the time of the ALJ's decision on June 27, 2007. (R. 22, 77.) She has a college education, and has previous work experience as an administrative assistant, an editorial writer, and a middle school teacher. (R. 22, 107-10, 115.) Plaintiff contends that she has been unable to work since December 17, 2004 due to back and pelvic pain, asthma, thyroid disorder, anxiety, depression, vaginal bleeding, and allergic rhinitis. (R. 56, 60, 77, 108.) Plaintiff is insured for benefits through December 31, 2008. (R. 82.)

---

[18](...continued)
1003 (11th Cir. 1987) ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[19] <u>Walker</u>, 826 F.2d at 1003.

[20] <u>Wolfe</u>, 86 F.3d at 1077-78.

[21] *See* <u>id</u>.

[22] *See* <u>Doughty v. Apfel</u>, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

***The ALJ's Findings***

In the ALJ's review of the record, including Plaintiff's testimony, medical records from several health care providers, and testimony from a vocational expert ("VE"), the ALJ determined that Plaintiff suffers from back pain; a back disorder (disc/ degenerative); thyroid disease; allergic rhinitis; asthma; depression; and anxiety disorder. (R. 17.) While these impairments are severe, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations. (R. 20-22.)

The ALJ then found that, from December 17, 2004 through December 21, 2005, Plaintiff retained the RFC to perform the exertional demands of less than the full range of sedentary work. (R. 22.) The ALJ limited Plaintiff to lifting and carrying no more than ten pounds occasionally, sitting for one to two hours per eight hour workday, standing and walking for one hour per eight hour workday, but with the inability to sustain the basic physical requirements of an eight hour workday or forty hour workweek due to pain, fatigue, and weakness. However, beginning on December 22, 2005, the ALJ found that Plaintiff had medical improvement impacting her RFC. Accordingly, as of December 22, 2005, the ALJ found Plaintiff retained the RFC to perform "low stress (non-production oriented), simple, unskilled [work], with one, two, or three step instructions." He found her capable of lifting and carrying ten pounds frequently; sitting for a total of six hours (with normal breaks) per eight hour workday with "a sit/stand option while remaining at the workstation (option means that the individual could sit/stand at will

while performing her assigned duties);" standing and/or walking (with normal breaks) for a total of two hours per eight hour workday; occasional balancing, stooping, crouching, kneeling, and crawling; and never climbing. According to the ALJ, Plaintiff should avoid: frequent ascending and descending of stairs, pushing and pulling motions with her lower extremities, and due to mild to moderate pain and medication side effects, Plaintiff should also avoid hazards in the workplace such as unprotected areas, moving machinery, heights, ramps, ladders, scaffolding, holes and pits. Plaintiff can perform pushing and pulling motions with her upper extremities within the aforementioned weight restrictions and she is able to perform unlimited activities requiring bilateral manual dexterity for both gross and fine manipulation with handling. Finally, the ALJ found that Plaintiff "has psychologically based symptoms which affect her ability to concentrate upon complex or detailed tasks but would remain capable of understanding, remembering, and carrying out simple job instructions." (R. 23-24.)

After finding that Plaintiff has been unable to perform her past relevant work since the alleged onset of disability on December 17, 2004, the ALJ proceeded to step five of the sequential analysis and concluded that, based on the Plaintiff's age, education, work experience, and RFC for the time period beginning on December 17, 2004 and ending on December 21, 2005, there were no jobs that existed in significant numbers in the national economy that Plaintiff could have performed. Accordingly, the ALJ concluded that Plaintiff was under a disability from December 17, 2004 through December 21, 2005. The ALJ also concluded that, due to medical improvement which occurred as of December 22, 2005, Plaintiff's RFC increased. As a result, the ALJ

applied Rule 201.28 of the Medical-Vocational Guidelines (the "grids")[23] as a "framework" and found that, because Plaintiff's ability to perform all or substantially all of the requirements of sedentary work was impeded by additional limitations, he consulted a vocational expert ("VE"). After considering the VE's testimony at the hearing, the ALJ concluded that, Plaintiff was able to perform a significant number of jobs in the national economy and, therefore, was not disabled as of December 22, 2005. (R. 27.)

***The Medical Evidence***

Because the one issue Plaintiff raises in her appeal focuses on the ALJ's assessment of her back pain, the Court will limit its discussion of Plaintiff's medical records accordingly.

Plaintiff initiated treatment with Stephen Hines, a chiropractor, in September 2003 complaining of pain in her lower back and right hip. According to Plaintiff, her pain interfered with her activities of daily living, sleep and work. Examination revealed a normal gait, restricted range of motion in the thoracolumbar spine, subluxation at L5-S1, and muscle spasms and tenderness in her lower lumbar and right gluteal region. (R. 209.) X-rays taken of Plaintiff's lumbar spine during her office visit revealed lumbar tilt to the right, and disc narrowing at L5-S1. (R. 208.) Dr. Hines attributed Plaintiff's symptoms and his clinical findings to subluxations at L5-S1, and lumbar disc syndrome with radiculopathy. (R. 209.) Plaintiff sought treatment with Dr. Hines through November 2003 and over the course of eight more office visits, Dr. Hines noted both subjective and objective improvement in Plaintiff's condition. By November 2003, Plaintiff reported

---

[23] 20 C.F.R. § 404, subpt. P, app. 2.

that she was able to return to exercising at the gym "with no increase of symptoms." (R. 206-07.)

Plaintiff did not return for further chiropractic treatment from Dr. Hines until over a year later. On January 18, 2005, Plaintiff presented with complaints of sharp and constant pain in her lower back and severe pain in her right hip. Plaintiff reported that her symptoms started a few days prior with no precipitating event and noted that she had previously sought treatment with Dr. Hines and that it made her feel better. Examination revealed subluxations at L4-L5 and T12-L1, palpation sensitivity in the lower lumbar spine and right hip, and minimal muscle spasms in her lower lumbar spine. Fabere Patrick sign[24] and straight leg raise testing were both negative. Dr. Hines' impression was lower back pain, lumbosacral strain, symptoms of bursitis of the right hip, and possible lumbar disc syndrome. He advised Plaintiff to restrict her activities until she felt better. (R. 205-06.)

Two days later, Plaintiff was seen in the emergency room of Munroe Regional Medical Center for complaints of sharp and acute back pain moderate in severity. Plaintiff advised that she started having back pain approximately a week ago and that she had an episode of low back pain two years prior. The triage nurse noted that Plaintiff was capable of independently performing activities of daily living, she had a normal gait, and there were no apparent motor or sensory deficits. Examination revealed Plaintiff's lumbar spine was non-tender with decreased range of motion and muscle spasms. Straight leg raise testing was negative bilaterally. (R. 181-85.) An x-ray

---

[24] The Fabere Patrick sign tests for disease of the hip joint.

of the lumbar spine revealed mild scoliosis and severe facet hypertrophic changes at L5-S1. (R. 266.) Plaintiff was diagnosed with acute myofascial lumbar strain. (R. 185.)

Between January 24, 2005 and March 3, 2005, Plaintiff returned to Dr. Hines for chiropractic treatment of her low back pain six times. (R. 200-03.) Plaintiff reported some improvement in her symptoms during that time period (e.g., increased range of motion and decreased tenderness in her lumbar spine) but advised that certain activities, e.g. bending, continued to aggravate her back. (R. 200.) Examinations consistently revealed restricted range of motion and tenderness without accompanying muscle spasms in her lower lumbar spine, and subluxations at L4-L5 and T12-L1. Dr. Hines' impression was low back pain, lumbosacral strain, probable lumbar disc protrusion, and facet joint arthrosis at L4-5. (R. 200-03.)

Plaintiff underwent an MRI of her lumbar spine in February 2005 which revealed a mild posterior disk bulge at the L4-L5 and L5-S1 levels, and grade one spondylolisthesis of L5 on S1 due to facet arthrosis. (R. 201.)

Plaintiff sought treatment from Dr. Charles Grudem, a pain management specialist, in March 2005. She complained of lower back pain which she attributed to an injury incurred during a slip and fall incident at a restaurant in November 2004. According to Plaintiff, she did not thereafter seek treatment for her resulting back pain until January 2005. Dr. Grudem noted that her descriptions of her pain were "dramatic." Examination revealed decreased curvature and increased muscle tone in the lumbar spine, muscle spasms and tenderness in her lumbar spine and hips bilaterally, positive straight leg raise testing at five degrees on the right side, limited range of motion in her

hips bilaterally and no motor deficits except for guarding pursuant to pain and tenderness in Plaintiff's right hip. Dr. Grudem diagnosed Plaintiff with low back pain, multiple myofascial sprain, right ischial bursitis, and bilateral superior gluteal nerve entrapment. He prescribed a pain medication and advised her to discontinue treatment with her chiropractor. (R. 284-88.)

Notwithstanding Dr. Grudem's recommendation to discontinue chiropractic treatment, Plaintiff returned to Dr. Hines for two more office visits in March 2005. She returned with complaints of pain in her lower back and hips and and reported that "simple things like shopping . . . cooking" and cleaning exacerbated her pain symptoms. Examination revealed subluxations at L4-L5, T12-L1, and C5-C6, tenderness in her lumbar spine and right hip, and restricted range of motion in her lumbar spine. Dr. Hines noted that Plaintiff's movements were "cautious and restricted." His impression was low back pain, lumbar spondylolisthesis of L5-S1, lumbar disc bulge at L4-L5 and L5-S1, facet joint arthrosis with degenerative disc disease at L5-S1, and bursitis of the right hip. (R. 199-200.)

During an office visit with an endocrinologist in late March 2005, Plaintiff's complaints included allegations of excruciating back pain since December 2004. The physician noted that Plaintiff has evidence of bulging discs at L4-L5 and was being treated with a variety of pain medications. According to the physician, "over the last week or so [Plaintiff] has been doing better and is doing some stretching exercises in order to try and become more mobile." Examination revealed a slightly enlarged thyroid

and the physician opined that Plaintiff's symptoms were consistent with hypothyroidism "which may be overlapping with back issues." (R. 213-14.)

In late March 2005, Plaintiff also returned to Dr. Grudem for a follow up visit complaining of constant lower back pain, intermittent sleeping disturbances, and increased emotional disturbances related to her medical conditions. She advised that her pain medications worked most of the time. Dr. Grudem prescribed an anti-anxiety medication. (R. 282-83.) A week later, Plaintiff reported that she continued to have constant lower back pain, but that her symptoms had improved since her last office visit. Plaintiff also reported that she felt off balance and her pain worsened with walking. Examination revealed tenderness, increased muscle tone, and muscle spasms in her lumbar spine. Dr. Grudem sent Plaintiff for x-rays of her pelvis, prescribed physical therapy, and recommended spinal injections if her symptoms did not improve. (R. 278-80.)

Pursuant to Dr. Grudem's referral, Plaintiff presented for an initial evaluation for physical therapy on April 14, 2005. Plaintiff reported lower back and hip discomfort that began in November 2004 following a fall at a restaurant. According to Plaintiff, upon getting up from her fall, she immediately had difficulty tolerating standing activities. Plaintiff advised that she recently quit a job because of her inability to tolerate prolonged periods of sitting and/or standing. Plaintiff reportedly had received several injections in her lower back which provided her with minimal relief. Examination revealed restricted range of motion in the lumbar spine and tightness in the bilateral hamstrings and right hip flexor muscles. Although Plaintiff's lower back strength was impaired, her sensation

was intact. Palpation of her right hip and buttock revealed moderate tenderness. Plaintiff rated the pain as an 8-9 out of 10. The therapist conducted a series of clinical tests which revealed positive results for straight leg raise testing on the right, sacroiliac compression/distraction testing, and Gillet/Flamingo testing over the left sacroiliac region. However, the results of lumbar quadrant, bowstring, Babinski's, Tinel's and Valsalva maneuver testing were all negative. The therapist noted that Plaintiff ambulated "with increased external rotation of the bilateral lower extremities" and examination of her sacrum revealed mild left rotation. The physical therapist's impression was left sacral torsion, right hip upslip, right piriformis syndrome, right iliopsoas spasm, and lumbosacral strain/sprain and opined that Plaintiff's rehabilitation potential was "good." (R. 305-10.)

During a consultative mental evaluation in May 2005 conducted by Colleen D. Character, Ph.D., a clinical psychologist, at the request of the Social Security Administration's request, Plaintiff's complaints included severe and constant lower back pain that she rated at a 10 out of 10 at its worst, and 6 to 7 out of 10 on a typical day. Plaintiff advised that she lives with her mother and noted that she regularly attends church (approximately three times per week), and although she is unable to dance or go to the beach like she used to, she reported being able to perform activities of daily living independently. Plaintiff reportedly was able to do her own shopping and she helped her mother cook and do laundry. Examination revealed a slow gait with no fine or gross motor skill deficits noted. Dr. Character opined that Plaintiff suffered from mild

depression, and a pain disorder associated with both psychological factors and a general medical condition. (R. 237-40.)

In May 2005, Plaintiff returned for additional pain management treatment with Dr. Grudem. She advised Dr. Grudem that her lower back pain, though constant, was improved since her last visit. Plaintiff reported that physical therapy had been helpful. (R. 276-77.) In a letter directed to Dr. Grudem and dated May 14, 2005, Plaintiff's physical therapist advised that Plaintiff had been coming for physical therapy one to two times per week over the prior four weeks for total of five visits. The therapist noted that muscular spasms were slowly decreasing in Plaintiff's lumbosacral muscles and piriformis on the right. Plaintiff's sacroiliac discomfort had decreased by 40-50%. The therapist also reported improvement in her sacroiliac alignment, flexibility in her trunk and lower extremities, and strength in her lower extremities. The therapist also noted that Plaintiff reported an increased tolerance of "static posturing in sitting and standing, and all activities of daily living including increased tolerance to ambulation with decreased giveway-type sensation of right lower extremity." Because Plaintiff had been "extremely compliant" with all therapeutic recommendations, the therapist opined that her rehabilitation potential continued to be good. (R. 303.)

A month later, Plaintiff's physical therapist advised Dr. Grudem via letter that Plaintiff had been receiving physical therapy one to two times a week over the prior four weeks for total of five visits. The therapist noted that Plaintiff's sacroiliac alignment had markedly improved and had remained in alignment for the past two weeks. Muscle spasms in her lumbar region and piriformis on the right had substantially decreased.

Plaintiff's flexibility and range of motion in her in trunk and lower extremities had improved by 50-60%, and her strength continued to improve in the muscles of her trunk, abdomen, gluteal region, and lower extremities. Again, Plaintiff reported a moderate increase in her tolerance of sitting and standing during activities of daily living. According to the physical therapist, "[Plaintiff] ha[d] benefitted quite well from physical therapy over the past four weeks and would continue to benefit . . . over the next four to six weeks, planning discharge at that time unless . . . she has any exacerbations in discomfort." (R. 299.)

On June 15, 2005, Plaintiff returned to Dr. Grudem for a follow up visit complaining of constant lower back pain with occasional sharp stabbing pain in her right hip. Plaintiff reported that physical therapy continued to be helpful and that her current medications were minimally helpful. Examination revealed soft tissue fullness over the bilateral greater trochanters with prominence on the right side, palpation sensitivity in the hips bilaterally, and slight elevation of Plaintiff's pelvis on the right side. Dr. Grudem diagnosed Plaintiff with lower back pain with spasm and multiple myofascial tender points, bilateral superior gluteal nerve entrapment, right ischial bursitis, and right piriformis syndrome and he ordered x-rays of Plaintiff's hips, pelvis and thighs bilaterally. (R. 272-74.)

Following her last office visit of record with Dr. Grudem, Plaintiff continued physical therapy over the course of six visits between June 16, 2005 and August 18, 2005. On June 16, 2005, Plaintiff reported decreased pain in the sacroiliac region. The therapist noted Plaintiff demonstrated good tolerance of all therapy exercises and

observed decreased muscle spasms in lumbosacral spine. (R. 297.) On June 24, 2005, Plaintiff advised that she experienced an increase in her sacroiliac discomfort after increased sitting activities. The therapist noted Plaintiff had good sacroiliac alignment and decreased muscle spasms in her thoracolumbar and sacral spine with decreased soft tissue restrictions after physical therapy treatment. (R. 297.) On June 29, 2005, Plaintiff reported her sacroiliac pain and aching had decreased and she had an increased tolerance to static positioning. Plaintiff tolerated all physical therapy treatment well and the therapist observed decreased spasms in the lumbosacral spine and bilateral gluteal regions. (R. 297.) On July 14, 2005, Plaintiff noted an improvement in her lumbosacral and gluteal pain. The therapist observed continued improvement in the muscle spasms in her lower back. (R. 296.) On July 21, 2005, the therapist noted that Plaintiff had "no difficulty" with therapeutic activities, and her complaints of lower back and hip pain had decreased. In addition, the therapist observed good alignment in her sacroiliac region. (R. 296.) During her last office visit of record on August 18, 2005, Plaintiff reported decreased pain in her lumbosacral spine and bilateral gluteal muscles and noted a minimal improvement of the muscle spasms she experienced in her lower back and hip after activity. The physical therapist recommended Plaintiff return for physical therapy on an "as needed" basis. (R. 296.)

On December 21, 2005, Plaintiff reported for a consultative examination with Dr. Dantuluri Raju at the request of the Social Security Administration. Among Plaintiff's "active problems" Dr. Raju listed: asthma, low back pain, hypothyroidism and constant pain in the lower back and sacrum. Dr. Raju noted that Plaintiff had history of moderate

limitations in her ability to complete activities of daily living. Plaintiff complained of low back pain, and swelling in her lower extremities which made it difficult for her to ambulate. Plaintiff also reported occasional numbness in her hands and feet. During his examination of Plaintiff, Dr. Raju observed that Plaintiff was able to get up and walk unassisted with a normal gait and she was also able to get on and off of the examination table without difficulty. Examination revealed normal strength, range of motion and sensation in her upper extremities bilaterally. Plaintiff ambulated with no limping or stiffness in her gait. Plaintiff's hand grip was normal with good power and intact dexterity with no signs of arthritis or deformities. Examination of Plaintiff's hips, knees, and ankles revealed no swelling or deformities. Plaintiff demonstrated full range of motion in her cervical spine with no stiffness. Plaintiff demonstrated moderate stiffness and tenderness with limited range of motion in her lumbar spine. Neurological examination revealed no motor or sensory deficits with normal and symmetrical deep tendon reflexes. Dr. Raju's impression was low back pain with mild scoliosis, hypothyroidism, asthma, allergic rhinitis, and mild conjunctivitis. (R. 339-42.)

Two state agency psychologists reviewed Plaintiff's medical records and concluded that, due to a possible mild depressive disorder, as well as possible psychological factors related to her pain, Plaintiff experienced mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence and pace; and no episodes of decompensation. (R. 241-53, 325-37.) With respect to their assessment of Plaintiff's ability to perform activities of daily living, one of the psychologists opined that she experienced mild limitations, (R. 335), while the other

opined that she did not experience any limitations in that area. (R. 251.) In their review of Plaintiff's medical records, the first state agency psychologist noted that Plaintiff's self-reported activities of daily living included: taking care of her handicapped mother, preparing breakfast, doing errands, food shopping, attending religious services, and door-to-door evangelizing. He opined that "despite some possible depression and possible psychol[ogical] factors in pain, [Plaintiff] continues to maintain a relatively normal level of activity; she is able to present and relate adequately cognitive [functioning] is intact; she retains the mental ability to carry out instr[uctions] and relate adequately in a work setting." (R. 241-53.) Both psychologists concluded that Plaintiff did not suffer from a severe mental impairment. (R. 241-53, 325-37.)

Two non-examining state agency physicians reviewed Plaintiff's file to assess her physical residual functional capacity. In May 2005, Dr. Mark Simmons opined that Plaintiff was capable of lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing and/or walking for six hours in an eight hour workday; sitting (with normal breaks) for about six hours in an eight hour workday; and pushing / pulling without limitation. He further found Plaintiff to be capable of occasional climbing of ramps and/or stairs, balancing, stooping, kneeling, crouching and crawling and no capacity for climbing ladders. Dr. Simmons noted Plaintiff's history of chronic back pain, her history of chest pain secondary to an anxiety disorder, and MRI results from May 2002 and February 2005. He further noted that a neurological examination of Plaintiff in March 2005 revealed normal reflexes, with no motor or sensory deficits, positive straight leg raise testing, but full range of motion in the lumbar spine and a normal gait. Dr.

Simmons concluded that Plaintiff's alleged symptoms are "somewhat consistent with medical findings and do present [medically determinable impairments]." (R. 255-61.) The second non-examining state agency physician, Dr. Donald Morford, reviewed Plaintiff's file in late December 2005 and opined that Plaintiff was capable of lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing and/or walking for six hours in an eight hour workday; sitting (with normal breaks) for about six hours in an eight hour workday; and pushing / pulling without limitation. Dr. Morford also imposed the same postural limitations as Dr. Simmons. In reaching the conclusion that Plaintiff's symptoms and complaints "seem to slightly exceed objective findings in the medical examination report," Dr. Morford referred to the recent report from consultative examining physician, Dr. Raju. Specifically, Dr. Morford noted that Dr. Raju's examination of Plaintiff revealed limited range of motion in lumbar spine but normal gait with motor and sensory functions intact. (R. 347-54.)

Plaintiff initiated treatment with Dr. Anthony Okoh in February 2006 when she presented with complaints of chest pain that had prompted a visit to the emergency room a few days prior. According to Plaintiff, her chest pain began shortly after a "big argument" with a family member. Plaintiff reported that after taking zoloft, her symptoms improved. At the time of her office visit with Dr. Okoh, Plaintiff complained of only mild discomfort in her chest. Examination revealed irregular heartbeat, mild tenderness in the left mid-lumbar area with no tenderness in her chest wall.  Dr. Okoh diagnosed

Plaintiff with chest pain, costochondritis,[25] and anxiety and he prescribed two anti-anxiety medications. He also gave Plaintiff samples of Celebrex, counseled her regarding relaxation techniques, and recommended exercise and walking for treatment of her anxiety symptoms. (R. 360.) During her next office visit on July 10, 2006, Dr. Okoh noted that Plaintiff was being seen status post a visit to the emergency room with complaints of shortness of breath and chest pain. The treatment note refers to complaints of tenderness in her temples and ankles bilaterally, as well as tenderness in Plaintiff's right chest wall. Dr. Okoh attributed Plaintiff's symptoms to a panic attack and pharyngitis and prescribed an anti-biotic and two medications to treat her asthma. He also recommended that she cut down on her salt intake. (R. 359.)

Plaintiff saw Dr. Okoh four more times between October 2006 and February 2007 for treatment of various complaints including: dizziness, anxiety, shortness of breath, nausea, irregular vaginal bleeding (R. 358), symptoms associated with the common cold (R. 357), the flu, intermittent right shoulder pain (R. 356), and a rash. (R. 355.)

On February 27, 2007, Dr. Okoh completed a form entitled "Medical Opinion re: Ability to do work-related activities (physical)" at the request of Plaintiff's attorney and opined that Plaintiff was capable of lifting no more than 10 pounds, standing and walking (with normal breaks) less than 2 hours in an eight hour workday, and sitting (with normal breaks) about 2 hours in an eight hour workday. He further opined that Plaintiff was able to sit for approximately fifteen minutes at a time before she would

---

[25] Costochondritis is defined as "inflammation of one or more [cartilages of the ribs], characterized by local tenderness and pain of the anterior chest wall that may radiate." STEDMAN'S MEDICAL DICTIONARY 450 (28th ed. 2006).

need to change position, and could stand for ten minutes before needing to change position. According to Dr. Okoh's assessment, Plaintiff would need to walk for about five minutes every ten minutes, would need to lie down at unpredictable intervals every four to six hours. He based these limitations on the January 2005 x-ray of Plaintiff's lumbar spine, and the May 2002[26] and February 2005 MRIs of Plaintiff's lumbar spine.

Dr. Okoh further opined that Plaintiff was capable of twisting, stooping, crouching, and climbing stairs occasionally, but never capable of climbing ladders. Her ability to reach, handle, finger and feel was impaired. According to Dr. Okoh, he imposed such limitations due to Plaintiff's subjective complaints that she experiences severe to moderate pain when reaching above her head or bending, and has "difficulty carrying two milk jugs, groceries, etc. ironing, typing, and performing repetitive activities." He found her ability to kneel and/or crawl was limited due to her back pain, her balance is poor, and he opined that she would not be able to handle photocopying duties due to her inability to handle the documents. (R. 366-68.)

### Plaintiff's Testimony

During the hearing on March 9, 2007, Plaintiff testified that she moved from New York to Ocala, Florida to live with her mother and take care of her after her mother fell ill in 2001. (R. 377.) She has a bachelor's degree from the University of Florida in journalism, and subsequently took courses at Central Florida Community College in an effort to get certified as a teacher. (R. 377, 382.) Plaintiff has previous work experience

---

[26] Although there is no record of Plaintiff having an MRI performed in May 2002, there is report from May 2002 that is associated with x-rays taken of Plaintiff's thoracic and lumbar spine which reveal mild degenerative changes. (R. 227.)

as an administrative assistant, a staff writer and copy editor for a newspaper, and a middle school teacher (R. 379, 381.) Plaintiff testified that she stopped working as a teacher in December 2004 when the semester ended and was thereafter unable to continue working as a teacher due to pain from injuries she incurred during a slip and fall incident at a restaurant in Miami in November 2004. (R. 383-85, 388, 390.) As a result of her fall, she injured her right knee, right thigh, right hip, and lower back. She did not go to the emergency room following her fall. (R. 386.)

Plaintiff testified that her chief complaint is her back pain. (R. 393.) According to Plaintiff, her back pain worsens with sitting, standing, stretching, and reaching activities and, as a result of her pain, she has difficulty twisting, stretching, reaching, standing for long periods of time, stooping, and typing for long periods of time. (R. 393-94.) Plaintiff testified that physical therapy helped her symptoms. (R. 401.) Prior to getting physical therapy, she had severe back pain and "nothing was tolerable let alone comfortable." (R. 401.) At the hearing (in March 2007), Plaintiff testified that her pain was no longer constant and she described her pain level as "much better than it was because [she] can sit." (R. 393.) According to Plaintiff, physical therapy treatment enabled her to "be able to move around." (R. 401) Eventually, Plaintiff discontinued physical therapy treatment because she ran out of money to pay for it. Nonetheless, she continued to do exercises at home as instructed by her physical therapist. Plaintiff testified that she continued to experience pain, but the pain was diminished. (R. 401-02) Plaintiff also testified that Dr. Okoh prescribed additional physical therapy, but she has not been able to afford it. (R. 403.)

With respect to Plaintiff's activities of daily living, Plaintiff testified that she is able to drive a car, do laundry, grocery shop (so long as she does not lift anything heavy), do some cooking, care for her own personal hygiene, and care for her mother. (R. 395-98.) Also, although she was unable to do the dishes for twelve to fourteen months after she was injured, she is now able to do the dishes again. (R. 396.) When asked whether she could do a job which entailed alternating between sitting and standing over course of an eight hour workday, Plaintiff responded, "definitely not" because she needs to lay down one or two times a day and she alternates between sitting, standing and reclining in a recliner chair once or twice an hour in an effort to relieve her pain. (R. 406-07.)

## IV. <u>DISCUSSION</u>

**The ALJ's Finding that Plaintiff Reached Medical Improvement as of December 22, 2005 Was Supported by Substantial Record Evidence**.

The Plaintiff argues that the ALJ committed reversible error in finding that Plaintiff was no longer disabled as of December 22, 2005 due to a medical improvement in her impairments. Specifically, Plaintiff challenges the ALJ's decision to credit the opinion of a consultative examining physician over that of a treating physician with respect to the functional limitations resulting from Plaintiff's back problems.[27]

Under the Social Security Act, an individual that has been awarded disability benefits may thereafter be found to no longer be entitled to such benefits where the individual has experienced medical improvement of his/her physical and/or mental

---

[27] Plaintiff argues that "the only evidence of record documenting Plaintiff's back pain after December 22, 2005" comes from Plaintiff's treating physician, Dr. Anthony Okoh. (Doc. 17 p. 10.)

impairments such that the impairments that were once disabling are no longer as limiting as they once were.[28] "Medical improvement" is defined as "any decrease in the medical severity of [a claimant's] impairment(s) . . . based on changes (improvement) in the symptoms, signs, and/or laboratory findings associated with [claimant's] impairment(s)."[29] However, even where an individual's impairment medically improves, the individual continues to be entitled to disability benefits absent evidence that the improvement relates to the individual's ability to work.[30]

After reviewing the evidence of record, the ALJ concluded that, as of December 22, 2005, Plaintiff's impairments had improved to the extent that Plaintiff was now capable of performing sedentary work on a sustained basis. After consulting a VE with Plaintiff's adjusted RFC, the ALJ found Plaintiff was capable of work that existed in significant numbers in the national economy and, therefore, was no longer disabled. (R. 23.) Plaintiff challenges this finding as unsupported by substantial evidence because, in making the decision, the ALJ rejected the opinion of Plaintiff's treating physician and instead relied on the opinion that was rendered by Dr. Dantuluri Raju, a consultative examining physician, on December 21, 2005. In particular, Plaintiff argues that the ALJ improperly disregarded Dr. Okoh's February 2007 assessment that Plaintiff continued to experience significant functional limitations due to her back pain.

---

[28] 42 U.S.C. § 423(f)(1).

[29] 20 C.F.R. § 404.1594.

[30] 20 C.F.R. § 404.1594(f)(4).

A treating physician's opinion on the nature and severity of a claimant's impairments is to be given controlling weight where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.[31] The ALJ has the discretion to give less weight to a treating physician's opinion or report regarding the claimant's capacity to work if the opinion is wholly conclusory or unsupported by objective medical evidence.[32] A treating physician's conclusory statements are entitled to only such weight as is supported by clinical or laboratory findings and other consistent evidence of the claimant's impairments.[33]

However, contrary to Plaintiff's assertion that her impairments remained unchanged since the date of her alleged onset of disability in December 2004, there is substantial evidence of record—including, but not limited to, Dr. Raju's report—that contradict Dr. Okoh's assessment and support the ALJ's conclusion that Plaintiff's symptoms had sufficiently improved as of December 2005 to warrant the ALJ's adjustment of his assessment of Plaintiff's residual functional capacity prior to December 22, 2005.

First, Plaintiff's physical therapy treatment notes from April 2005 through August 2005 reflect both objective and subjective improvement in Plaintiff's condition. Prior to Plaintiff's initial evaluation with her physical therapist in April 2005, medical records from

---

[31] 20 C.F.R. § 404.1527(d)(2).

[32] Edwards v. Sullivan, 937 F.2d 580, 584 (11th Cir. 1991) (ALJ had no obligation to defer to treating physician's opinion where physician conceded he was unsure of the accuracy of his findings).

[33] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

multiple treating sources noted Plaintiff's complaints of constant pain moderate in severity with an inability to sit, stand, or walk for long periods of time. Clinical findings consistently revealed a restricted range of motion in Plaintiff's lumbar spine with muscle spasms and tenderness. Plaintiff's chiropractor noted Plaintiff's movements were "cautious and restricted" in March 2005. Plaintiff's pain management doctor noted that Plaintiff demonstrated "guarding" with respect to clinical testing of her right hip.

During her initial evaluation for physical therapy in April 2005, Plaintiff's therapist observed that Plaintiff was capable of approximately 25 to 50% of the normal range of motion in her lumbar spine. In addition to several positive clinical signs indicative of organic causes of Plaintiff's back pain, examination also revealed an obviously impaired gait due to a mildly rotated sacrum, impaired muscle strength in the muscles of Plaintiff's lumbar spine and lower extremities, sensory and motor deficits in Plaintiff's lower extremities, and moderate tenderness in Plaintiff's right hip, right buttock, right groin and lumbar spine. However, over the course of approximately sixteen physical therapy sessions between April and August 2005, Plaintiff's physical therapist observed marked improvement in Plaintiff's symptoms. The therapist observed substantial improvement in Plaintiff's spasms, sacroiliac alignment, strength and flexibility in her trunk and lower extremities. Plaintiff's therapist also observed that, although Plaintiff continued to experience pain and spasms in her lower back and hips, her subjective complaints of pain and spasms reportedly diminished by approximately 60%. In addition, Plaintiff's tolerance of prolonged sitting, standing, walking and physical therapy activities improved to the point where, in July 2005, the therapist noted that Plaintiff had

an increased tolerance for "static positioning" such as standing and sitting and, further, Plaintiff was able to perform all physical therapy activities with "no difficulty." Due to the results Plaintiff achieved via physical therapy, she was ultimately instructed to return for additional therapy on an "as needed" basis in August 2005.

Second, and consistent with the improvement noted by Plaintiff's physical therapist, Dr. Raju's examination of Plaintiff in December 2005 also revealed an improvement in Plaintiff's overall condition. For example, although Plaintiff still demonstrated stiffness and tenderness in her lumbar spine, Dr. Raju noted normal shape and curvature of the dorsal spine and observed that Plaintiff was able to get on and off of the examination table without difficulty and she was also capable of getting up and walking without assistance. Plaintiff's gait was normal without any apparent limping or stiffness. Moreover, Dr. Raju's examination revealed no muscular atrophy or deformities, no gross neurological deficits, intact sensory and motor functions, and examination of Plaintiff's hips and lower extremities was unremarkable.

Third, Plaintiff's own testimony and her self-reported activities of daily living further corroborate the improvement in her symptoms that was observed by both her physical therapist and Dr. Raju. According to her testimony, physical therapy helped Plaintiff's symptoms. Prior to physical therapy, "nothing was tolerable." Although she testified that she continued to experience back pain, it was diminished and she described her pain level as "much better than it was because [she] can sit." According to Plaintiff, physical therapy enabled her to "be able to move around." In addition to conceding during her testimony at the hearing before the ALJ that her symptoms had

improved since her alleged onset in December 2004, Plaintiff also testified that she was capable of independently performing several activities inconsistent with disabling pain. For example, she testified that she is able to drive a car, do laundry, and care for her own personal hygiene. Further, and contrary to complaints noted by her chiropractor in March 2005, Plaintiff testified that, as of March 2007, she was once again able to grocery shop (subject to her inability to lift anything heavy), do dishes, and help do some cooking. She also reportedly attended religious services regularly three times a week, engaged in "door-to-door" evangelizing, and took care of her handicapped mother. Plaintiff's self-reported activities of daily living and Plaintiff's testimony at the hearing clearly demonstrate that Plaintiff's pain was not as incapacitating as would be expected of a person with the significant limitations Dr. Okoh imposed.

Finally, in addition to the fact that Dr. Okoh's February 2007 opinion was inconsistent with the evidence of record as a whole, the ALJ explained that he gave it less weight because it lacked sufficient "explanations and/or any objective clinical signs" to support the functional limitations Dr. Okoh imposed. Specifically, the ALJ found Dr. Okoh's assessment of Plaintiff was inconsistent with his own treatment notes. Although Dr. Okoh treated Plaintiff during six office visits over the course of approximately a year, Plaintiff did not initiate treatment with Dr. Okoh until nearly a year after Plaintiff's abnormal MRI of the lumbar spine and approximately two months after Dr. Raju's examination of Plaintiff in December 2005. Further, Dr. Okoh's treatment notes reflect that he predominantly treated Plaintiff for her anxiety symptoms and not for complaints related to Plaintiff's back and hip problems.

Further, in contrast with the medical records from Dr. Grudem, Dr. Raju, and Plaintiff's physical therapist, Dr. Okoh's treatment notes are silent as to any objective clinical findings associated with Plaintiff's back and hip problems. Although Dr. Okoh does cite to the abnormal x-ray and MRI results in his February 2007 opinion, none of his prior treatment notes mention the diagnostic studies nor do any of the treatment notes include a diagnosis or assessment related to Plaintiff's long history of back and hip problems. Moreover, in the several months following the MRI of Plaintiff's lumbar spine taken in February 2005, treatment notes from several treating physicians - including Dr. Grudem - demonstrate a pattern of improvement in Plaintiff's symptomatology. Thus, while the diagnostic studies demonstrate that Plaintiff has a medical condition that could reasonably be expected to cause disabling symptoms, when viewed in context in combination with the remainder of the medical evidence as a whole – in the absence of corroborating clinical findings, the diagnostic studies are insufficient to support Dr. Okoh's extreme assessment.

Dr. Okoh's treatment notes span a period of over a year. Notably, however, during that time period, it does not appear that Dr. Okoh ever even treated Plaintiff for back and/or hip pain. Accordingly, in view of the fact that Dr. Okoh never noted any subjective complaints of back and/or hip pain by Plaintiff, never noted any clinical findings concerning Plaintiff's back condition, and apparently never even rendered any medical treatment specific to Plaintiff's back condition fully support the ALJ's decision to discount Dr. Okoh's unsupported opinions regarding Plaintiff's functional limitations from her back condition.

For these reasons, the ALJ properly determined that Plaintiff was entitled to a closed period of disability commencing December 17, 2004 and ending December 21, 2005 and the ALJ's decision to discount the February 2007 opinion of Dr. Okoh is fully supported by the substantial evidence.

## V.  CONCLUSION

In view of the foregoing, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter final judgment in favor of the Commissioner consistent with this Order and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on December 10, 2009.

GARY R. JONES
United States Magistrate Judge

Copies to:
     All Counsel